McCULLOUGH, Judge.
 

 Plaintiff Robert Christopher Melton (Melton) appeals from the dismissal of his lawsuit for discovery violations and other misconduct, and from the denial of his motion to have the trial judge who entered the dismissal order recused. We affirm.
 

 FACTS
 

 On 20 May 2000, a pedestrian walkway collapsed at the Lowe's Motor Speedway (the Speedway) in Concord, North Carolina, causing injuries to several people who were using the walkway to leave a NASCAR event. Defendant Tindall Corporation (Tindall) had been involved in constructing the collapsed walkway.
 

 As a result of the walkway collapse, approximately 100 people, including Melton, filed actions against,
 
 inter alia,
 
 Tindall and the Speedway. Melton's lawsuit alleged that negligence by Tindall and the Speedway was the proximate cause of his bodily injury, lost wages, and/or diminution in his future earning capacity.
 

 The Honorable Chief Justice of the North Carolina Supreme Court designated each case related to the walkway collapse an "exceptional" case pursuant to Rule 2.1 of the General Rules of Practice for the Superior and District Courts, and each case was assigned to be heard by Superior Court Judge W. Erwin Spainhour. As such, Melton's case was designated "exceptional" and assigned to Judge Spainhour.
 

 In early 2003, the first pedestrian walkway case was tried. In that case, the jury found that the Speedway and Tindall were liable. Accordingly, Judge Spainhour ruled that the issue of liability had been established by collateral estoppel with respect to the remaining plaintiffs. Thus, Melton's suit required only a trial to determine his damages. The Speedway eventually settled with Melton, leaving Tindall as the only defendant with respect to Melton's lawsuit.
 

 At some point in the litigation, it became clear that Melton's lost profits and diminution in future earnings capacity claims hinged upon his assertion that he was self-employed as a general contractor. Discovery indicated that Melton had built one house, and the profits that he supposedly received from the sale of this house were central to his claim for damages.
 

 Discovery with respect to the profits from the sale of the house, like all of the discovery in the pedestrian walkway cases, was governed by a series of orders entered by Judge Spainhour, as well as by the North Carolina Rules of Civil Procedure. Given the voluminous discovery he was designated to oversee, Judge Spainhour conducted a series of status conferences and entered a number of Case Management Orders (CMOs) to govern the conduct of parties. In CMO No. 1, entered 20 September 2001, the judge set forth,
 
 inter alia,
 
 the following discovery guidelines:
 

 It is the expectation of the Court that all discovery in these cases will be conducted in a manner that is in keeping with both the letter and spirit of the Rules of Civil Procedure relating to discovery and the provisions of this Order. It is the Court's expectation that
 
 all discovery responses will contain full and complete answers and responses, and will be provided in a timely fashion.
 
 It is also the Court's expectation that counsel for all parties will cooperate with one another regarding the scheduling of depositions and other matters relating to discovery in a manner so that the necessary discovery in this matter can be conducted in a productive manner with minimal involvement by the Court. Counsel for the parties shall first engage in good faith attempts to resolve any and all disputes and objections regarding discovery before seeking the ... judge's assistance. Motions to compel shall specifically describe the discovery requests at issue.
 

 (Emphasis added.) In CMO No. 5, entered 30 October 2002, the judge made the following directive:
 

 9. By the earlier of November 1, 2002, or two (2) weeks before the date(s) scheduled for mediation, every Plaintiff shall serve on Defendants' counsel (i)
 
 supplemental responses
 
 to the Defendants' First Set of Interrogatories and Request for Production of Documents, and (ii) a certification that a complete and updated set of
 medical records and bills, life care plans and economic appraisals/reports have been provided to Defendants' counsel.
 

 (Emphasis added.)
 

 Early in the litigation, the following requests for production of documents were addressed to Melton:
 

 REQUEST NO. 5: All statements, bills, invoices, receipts, checks and other documents that relate in any way to the items of expense or loss for which you seek compensation in this action.
 

 * * * *
 

 REQUEST NO. 6: Any and all documents that you contend support your claim, if any, of lost wages caused by the [i]ncident.
 

 Plaintiff was also asked to produce all of his federal and state income tax returns filed for the years of 1995-2000.
 

 In a deposition taken on 5 December 2001, Melton testified that, in 2001, he made a profit of "approximately $18,000" on the sale of the house he had built. Defense counsel later discovered that Melton had not produced certain income tax documents for 2001 and 2002. Melton's attorney was notified of these omissions in a 9 May 2003 letter stating the following:
 

 [I]t appears that ... Melton has never produced copies of his 2001 or 2002 income tax returns, or any 1099 or W-2 forms for 2002. These documents are obviously relevant to Mr. Melton's claim of lost earnings, since they relate to his earning capacity and act to mitigate his claimed damages. As such, these documents should have been produced in response to various document requests, including Requests no[s]. 5 and 6 in the Speedway's First Request for Production of Documents and Tindall's Comprehensive Request for Supplementation. Please have these documents delivered to me by Tuesday, May 13.
 

 In a 12 May 2003 letter, Melton's lawyer responded by noting that "Mr. Melton is unable to locate his actual [2001] income tax records." Along with the letter, Melton included his 2002 tax returns.
 

 Tindall subsequently filed a motion to compel production of Melton's 2001 tax documents. At the hearing on this motion, the following colloquy ensued:
 

 [PLAINTIFF'S ATTORNEY]: ... I contacted Mr. Melton [with respect to the 2001 tax documents] about three, four times to try and get them from him. He contacted the IRS and he tried to get them, and he couldn't get them. And that was the response I got from Mr. Melton.
 

 THE COURT: Well, he certainly can get them. I've done it myself. He is incorrect about that....
 

 [DEFENSE COUNSEL]: You can get the form off the web site, Judge.
 

 THE COURT: Right.
 

 [PLAINTIFF'S ATTORNEY]: Again, I'm just-we tried to get it, and I have the letter saying the response from him and my paralegal trying to get them. And I certainly have no problem trying to get them. We've tried a number of times to do that.
 

 On 30 September 2003, Judge Spainhour entered an order requiring Melton to obtain his 2001 federal income tax return and Form 1099 from the Internal Revenue Service and compelling production of these documents. A Form 4506 "Request for Copy or Transcript of Tax Form" was attached to the order.
 

 Melton subsequently provided defense counsel with a 2001 federal individual income tax return dated
 
 8 October 2003,
 
 after entry of the order compelling production of this document. The only income reported for 2001 on this return was $15,979.00, the amount paid to Melton by an employer, Jensen Construction, in 2001. Thus, this return did not reflect that Melton had profited from the sale of a house in 2001. Melton did not produce the Form 1099 relating to the sale of his house as required by Judge Spainhour's order. Furthermore, though the order compelling production of documents did not specifically require Melton to produce his 2001 North Carolina income tax return, the letter from his attorney accompanying the federal tax return indicated that "Melton's income tax records for 2001" were enclosed with the letter. No 2001 state tax return was included in the mailing.
 

 On 10 October 2003, Tindall filed a motion to strike Melton's lost profits evidence on the ground that he had produced no documents to substantiate his claim. Further, Tindall alleged that Melton either failed to report profits from the sale of his house to the IRS, or falsely represented to the court that he earned profits from the sale of a house he had built. As an alternative to striking evidence, Tindall's motion requested that it be allowed to re-depose Melton regarding the 2001 tax return, the missing Form 1099, and all related issues. Judge Spainhour entered an order permitting Tindall to re-depose Melton and again ordered Melton to "deliver to counsel for Tindall all documents relating in any way to the construction and sale of the house owned by [him] that was sold in 2001, including but not limited to the 1099 Form for such sale, regardless of whether such documents have previously been produced to Tindall."
 

 Just prior to being re-deposed on 20 October 2003, Melton produced another 2001 federal income tax return dated
 
 16 October 2003,
 
 which did include income from the sale of a house. During the deposition, Melton stated that he had only filed one federal income tax return for 2001: the one dated 8 October 2003. He claimed to be waiting to file the return dated 16 October 2003 until his deposition had been completed. Melton admitted that he did not include the income from the sale of the house he built in the 8 October return because he "didn't have the money at the time to pay ... the taxes." Later in the deposition, Melton's lawyer asserted that the Fifth Amendment right against self-incrimination allowed Melton to decline to respond to a question about whether he "deliberately didn't tell the IRS about [the] profits [from the house]." Further, Melton generally declined to answer specific questions about the items on the 16 October return based upon his assertion that his father had prepared it. With respect to his 2001 state income tax return, Melton equivocated: at first, he claimed that he had filed a 2001 North Carolina income tax return without making payment and that a copy of the return was at his residence, but he later indicated that the return had not even been prepared. Melton further admitted that he did not actually have any income tax returns for 2001 when his attorney indicated that Melton was "unable to locate" such records and that he never mistakenly thought that he had already filed his tax returns.
 

 Following this deposition, Tindall filed a supplement to its motion to strike the lost profits evidence in which it requested,
 
 inter alia,
 
 that all of Melton's claims be dismissed. Just prior to the hearing on this motion, Melton filed a motion to recuse Judge Spainhour. Judge Spainhour entered an order referring the recusal motion to another judge to be appointed by the North Carolina Administrative Office of the Courts (AOC). AOC appointed Superior Court Judge Thomas W. Seay, Jr., to rule on the motion. After conducting a hearing, Judge Seay determined that "there [was] no believable evidence of any bias, prejudice, or favoritism for or against any party" and that "neither the records in th[e] case [nor] any evidence or exhibits offered ... create[d] a reasonable perception that Judge Spainhour would be unable to rule impartially or would, for any reason, fail to provide the plaintiffs and defendants with a fair and impartial trial." Accordingly, Judge Seay denied the motion for recusal.
 

 After the denial of the recusal motion, Judge Spainhour conducted a hearing on Tindall's pending motion to strike Melton's lost profits evidence and/or dismiss his claims. In an order entered 13 April 2004, Judge Spainhour determined the following:
 

 27. By failing to produce his 2002 income tax returns in a timely fashion, Melton violated both [North Carolina Rules of Civil Procedure] 26 and 34 and Case Management Order[s]... 1 and 5.
 

 28. By failing to produce his 2001 North Carolina income tax return[], Melton violated both [North Carolina Rules of Civil Procedure] 26 and 34 and Case Management Order[s] ... 1 and 5.
 

 29. The representation to [defense] counsel in the letter from Melton's counsel dated May 12, 2003 that Melton had
 been unable to locate his 2001 income tax documents was false.
 

 30. The representations to the Court in the September 19, 2003 hearing that Melton had made repeated efforts to obtain his 2001 federal income tax returns from the Internal Revenue Service were false.
 

 31. Melton knew at the time of the foregoing letter to Tindall's counsel and at the time of the September 19, 2003 hearing that he had not filed his 2001 federal income tax return[].
 

 32. The October 8, 2003 version of Melton's 2001 federal income tax return[] contradict[s] Melton's deposition testimony that he had sold a house for a profit.
 

 33. Melton's refusal to answer questions regarding the filing of his 2001 federal income tax return[], citing his Fifth Amendment right against self-incrimination, was inappropriate since Melton had already admitted that he had intentionally filed [an] incorrect return[] and thereby had waived his Fifth Amendment privilege....
 

 34. Even if Melton had not waived his Fifth Amendment rights as to the filing of the 2001 federal return[], a plaintiff who invokes the Fifth Amendment to block discovery by the defendant in a civil action subjects his claim to dismissal....
 

 35. By having a third party prepare the October 16, 2003 version of his 2001 federal income tax return[], Melton acted to frustrate the Court's verbal [o]rder ... as well as Tindall's efforts to obtain discovery on a material issue in this case.
 

 36. Melton has engaged in a pattern of intentional misconduct that was apparently designed to prevent Tindall from pursuing discovery on the issue of the profits of the house supposedly sold for a profit in 2001. In doing so, Melton violated [North Carolina Rules of Civil Procedure] 26 and 34 and the [o]rders of th[e] Court, made misrepresentations to th[e] Court and opposing counsel, wrongly refused to answer questions in a court-ordered deposition, and offered contradictory testimony as to the existence of important documents.
 

 37. ... Melton had several opportunities to mitigate the harm caused by such conduct. For example, after Melton's failure to produce 2001 tax records was pointed out by Tindall, Melton could have admitted that no such records had been generated, instead of making misrepresentations to the Court and counsel for Tindall on the issue. Similarly, after the Court issued its October 13, 2003[o]rder that Melton be re-deposed, Melton could have testified fully and truthfully regarding the existence and content of the 2001 tax returns. Instead, Melton refused to answer questions regarding the federal return[] and gave contradictory testimony regarding the state return[].
 

 (Citations omitted). After considering other sanctions, Judge Spainhour concluded that "sanctions less severe than dismissal would not be adequate given the seriousness of the misconduct." Accordingly, Melton's claims were dismissed pursuant to N.C. Gen.Stat. § 1A-1, Rules 37 and 41.
 

 From the dismissal of his claims and the denial of his recusal motion, Melton now appeals.
 

 I.
 

 We first address Melton's arguments concerning the dismissal of his claims due to discovery violations and other misconduct. These arguments lack merit.
 

 At the outset, we note that Judge Spainhour dismissed Melton's claims pursuant to both N.C. Gen.Stat. § 1A-1, Rules 37 and 41. Rule 37 provides that "[i]f a party ... fails to obey an order to provide ... discovery ... [,] a judge of the court in which the action is pending may make such orders in regard to the failure as are just, and among others ... [a]n order ... dismissing the action or proceeding or any part thereof...."
 

 N.C. Gen.Stat. § 1A-1, Rule 37(b)(2)(c) (2003). The imposition of sanctions under Rule 37 "is in the sound discretion of the trial judge and cannot be overturned absent a showing of abuse of that discretion."
 
 Bumgarner v. Reneau,
 

 332 N.C. 624
 
 , 631,
 
 422 S.E.2d 686
 
 , 690 (1992).
 

 An abuse of discretion may arise if there is no record evidence which indicates that defendant acted improperly, or if the law will not support the conclusion that a discovery violation has occurred.
 
 See Cloer v. Smith,
 

 132 N.C.App. 569
 
 , 573,
 
 512 S.E.2d 779
 
 , 782 (1999) (discussing a trial court's findings with respect to discovery violations and holding that "the deposition transcript supports the trial court's findings that counsel for [one of the parties] refused to allow [the party] to answer some questions, and, in other instances, `told [the party] what to say'");
 
 King v. Koucouliotes,
 

 108 N.C.App. 751
 
 , 754,
 
 425 S.E.2d 462
 
 , 464 (conducting a legal analysis to determine "whether ... trial witnesses and trial exhibits are discoverable"),
 
 disc. review improvidently allowed,
 

 335 N.C. 164
 
 ,
 
 436 S.E.2d 132
 
 (1993). Further, "[t]he choice of sanctions under Rule 37 is within the trial court's discretion" and is reviewable only for an abuse of discretion.
 
 Brooks v. Giesey,
 

 106 N.C.App. 586
 
 , 592,
 
 418 S.E.2d 236
 
 , 239 (1992),
 
 aff'd,
 

 334 N.C. 303
 
 ,
 
 432 S.E.2d 339
 
 (1993).
 

 Rule 41 permits a trial court to dismiss an action or claim "[f]or failure of the plaintiff ... to comply with the[] rules [of Civil Procedure] or any order of [the] court." N.C. Gen.Stat. § 1A-1, Rule 41(b). "[T]he power to sanction disobedient parties, even to the point of dismissing their actions or striking their defenses, did not originate with Rule 41(b). It is longstanding and inherent. For courts to function properly, it could not be otherwise."
 
 Minor v. Minor,
 

 62 N.C.App. 750
 
 , 752,
 
 303 S.E.2d 397
 
 , 399 (1983) (citation omitted). Dismissal under Rule 41(b) is left to the sound discretion of the trial court and will not be disturbed on appeal in the absence of a showing of abuse of discretion.
 
 Kerik v. Davidson Cty.,
 

 145 N.C.App. 222
 
 , 227,
 
 551 S.E.2d 186
 
 , 190 (2001).
 

 A.
 

 Melton first contends that the findings and conclusions by Judge Spainhour that catalogue his misconduct are unsupported by evidence in the record. Melton specifically cites five allegedly vacuous determinations.
 

 First, he alleges there is no evidence in support of Judge Spainhour's finding that Tindall was denied discovery relating to the costs of, and profits from, the sale of Melton's house in 2001. However, by failing to timely produce a copy of his 2001 income tax return that stated profits from the sale of the house, Melton did, in fact, deny Tindall at least some discovery with respect to his profits from the sale. Moreover, in his 20 October 2003 court-ordered deposition, Melton was evasive when discussing specific figures concerning the costs of building the house and stated that his father handled the books. Thus, there is ample evidentiary support for Judge Spainhour's finding.
 

 Second, Melton asserts that the record does not support the determinations that he falsely represented to the court and opposing counsel that he had filed his 2001 federal income tax return before 8 October 2003. The basis of this argument is Melton's contention that his lawyer's statements, which indicated that the 2001 federal income tax return was filed as of a hearing in September of 2003, are not attributable to Melton. However, it is the established law of this State that, especially with respect to discovery, "admissions of attorneys are binding upon their clients, and are generally conclusive."
 
 Karp v. University of North Carolina,
 

 78 N.C.App. 214
 
 , 216,
 
 336 S.E.2d 640
 
 , 641 (1985);
 
 see also Henderson v. Wachovia Bank of N.C.,
 

 145 N.C.App. 621
 
 , 624,
 
 551 S.E.2d 464
 
 , 467 (noting that there is "a preference in the law to impute lawyer conduct to clients"),
 
 disc. review denied,
 

 354 N.C. 572
 
 ,
 
 558 S.E.2d 869
 
 (2001). The facts and circumstances of the instant case do not justify deviation from this principle. Thus, Judge Spainhour was not precluded from finding that there were false representations to the court and opposing counsel concerning when Melton had filed his 2001 federal income tax return.
 

 Third, Melton avers that there was no evidence in support of Judge Spainhour's ruling that the 8 October 2003 version of Melton's 2001 federal income tax return contradicted his deposition testimony that he sold his house for a profit. However, it is undisputed that the 8 October 2003 version of Melton's 2001 federal tax return did not report a profit from the sale of a house and that Melton's deposition testimony indicated that he did profit from the sale of a house.
 

 Fourth, Melton alleges that there was no evidentiary support for Judge Spainhour's determination that he acted to frustrate a court order and Tindall's efforts to obtain discovery by having his father prepare the 2001 tax return dated 16 October 2003. Our review indicates that Judge Spainhour ordered Melton to be deposed on,
 
 inter alia,
 
 "the issuance and filing of tax documents relating to his income in 2001." However, Melton testified during his court-ordered deposition that he was not familiar with the figures on the revised return because his father had prepared it. This evidence was sufficient to permit Judge Spainhour's determination that Melton acted to frustrate the order and that he had hindered Tindall's efforts to obtain discovery.
 

 Fifth, Melton argues there was no evidence to support Judge Spainhour's determination that he had engaged in a pattern of intention misconduct to prevent Tindall from pursuing discovery on the issue of profits from the home. In essence, this argument is a catch-all argument in which Melton insists that, because there was no evidence of any misconduct at all, Judge Spainhour could not find the misconduct to be intentional. However, as already indicated, the evidence of misconduct was substantial. Moreover, the evidence before Judge Spainhour easily permitted him to conclude that Melton had engaged in a pattern of misconduct to thwart discovery.
 

 B.
 

 Melton next argues that Judge Spainhour erroneously concluded that he had committed discovery violations by failing to produce his 2001 North Carolina income tax return. We do not agree.
 

 "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action ..., including the existence, description, nature, custody, condition and location of any ... documents, or other tangible things...." N.C. Gen.Stat. § 1A-1, Rule 26(b)(1) (2003). Discovery may be made by an appropriate request for the production of documents. N.C. Gen.Stat. § 1A-1, Rule 26(a). A party generally has no duty to supplement discovery "that was complete when made"; however "[a] duty to supplement responses may be imposed by order of the court, agreement of the parties, or at any time prior to trial through new requests for supplementation of prior responses." N.C. Gen.Stat. § 1A-1, Rule 26(e)(3).
 

 "Any party may serve on any other party a request ... to produce... any designated documents...." N.C. Gen.Stat. § 1A-1, Rule 34(a) (2003). "[I]nspection and related activities will be permitted as requested, unless the request is objected to, in which event the reasons for objection shall be stated." N.C. Gen.Stat. § 1A-1, Rule 34(b).
 

 In addition, Judge Spainhour's CMO No. 1 required the parties to conduct discovery in accordance with "both the letter and spirit of the Rules of Civil Procedure relating to discovery" and ordered all discovery responses to "contain full and complete answers and responses, and [to] be provided in a timely fashion." Judge Spainhour's CMO No. 5 required discovery responses to be supplemented.
 

 In a request for production of documents, Melton was asked to turn over all documents related "in any way" to his claim of lost wages caused by the walkway failure. On 9 May 2003, a defense attorney wrote a letter to Melton's lawyer stating that he did not yet have Melton's 2001 tax records and that these records should have been produced pursuant to the request for production of documents. Melton's attorney replied that the 2001 records had been lost but did not assert that they were not discoverable. Thereafter, Judge Spainhour ordered Melton to be re-deposed regarding "the issuance and filing of tax documents relating to his income
 in 2001" and required him to produce "all documents relating in any way to the construction and sale of the house ... that was sold in 2001." Melton has never argued that his 2001 state tax return was not covered by defense requests and orders of the court, and he does not dispute that, as of the date of his dismissal hearing, he had not produced his 2001 state tax return. As Melton's deposition testimony was equivocal as to whether such a return had been prepared and filed, Judge Spainhour was permitted to conclude that the document existed and had not been produced. Further, we conclude that there was no error in Judge Spainhour's conclusion that Melton's failure to produce the 2001 state return violated his duties to produce discoverable documents and supplement discovery responses as mandated by N.C. Gen.Stat. § 1A-1, Rules 26 and 37, as well as CMOs Nos. 1 and 5.
 

 C.
 

 In his next argument on appeal, Melton contends that Judge Spainhour's Fifth Amendment analysis was inappropriate. Judge Spainhour concluded that Melton had waived his Fifth Amendment right to refuse to provide self-incriminating testimony, but that, even if there was no waiver, Melton had subjected his claim to dismissal by invoking the right to block discovery by defendant.
 

 This Court has held that a civil plaintiff who invokes the Fifth Amendment to thwart discovery subjects his claim to dismissal.
 
 Sugg v. Field,
 

 139 N.C.App. 160
 
 , 164,
 
 532 S.E.2d 843
 
 , 846 (2000). However, "before dismissing a claim based upon plaintiff's refusal to testify in reliance upon the privilege against self-incrimination, [a] court must employ [a] balancing test ... weighing [plaintiff]'s privilege against self-incrimination against the other party's rights to due process and a fair trial."
 

 Id.
 

 (citations omitted).
 

 In the instant case, one of the purposes of the court-ordered deposition of Melton was to determine whether he profited from the sale of a house. Defense counsel was asking questions designed to show whether there were such profits, in which case Melton had been dishonest on the only 2001 federal tax return that he had actually filed, or no such profits existed, in which case Melton was being dishonest with defense counsel and the court. Therefore, Melton's decision to assert the Fifth Amendment, rather than answer a question concerning why he did not tell the IRS about the profits, served to impede Tindall's ability to obtain accurate discovery about the nature of the profits from the sale of the house. Judge Spainhour's order is replete with references to the importance of this information, and it properly indicates that the value of asserting the Fifth Amendment was minimal in light of the conduct Melton had already disclosed. Accordingly, even assuming
 
 arguendo
 
 that Melton did not waive his right to assert the Fifth Amendment, Judge Spainhour properly ruled that, by so doing, Melton subjected his claims to dismissal.
 

 D.
 

 In his next argument on appeal, Melton contends that Judge Spainhour erred by dismissing his claims without first considering less severe sanctions. A dismissal pursuant to Rule 41 "should be applied `only when the trial court determines that less drastic sanctions will not suffice.'"
 
 Miller v. Ferree,
 

 84 N.C.App. 135
 
 , 136,
 
 351 S.E.2d 845
 
 , 847 (1987). Likewise, "`[b]efore dismissing a party's claim with prejudice pursuant to Rule 37, the trial court must consider less severe sanctions.'"
 
 Global Furn., Inc. v. Proctor,
 

 165 N.C.App. 229
 
 , 233,
 
 598 S.E.2d 232
 
 , 235 (2004) (citation omitted). "The trial court is not required to
 
 impose
 
 lesser sanctions, but only to
 
 consider
 
 lesser sanctions."
 

 Id.
 

 Moreover, this Court will affirm an order for sanctions where "it may be inferred from the record that the trial court considered all available sanctions" and "the sanctions imposed were appropriate in light of [the party's] actions in th[e] case."
 
 Hursey v. Homes by Design, Inc.,
 

 121 N.C.App. 175
 
 , 179,
 
 464 S.E.2d 504
 
 , 507 (1995). In the instant case, Tindall filed a motion which requested that Melton be sanctioned with the dismissal of his claims but also requested, in the alterative, lesser sanctions. Judge Spainhour's order states that
 [t]he Court has carefully considered each of [Melton's] acts [of misconduct], as well as their cumulative effect, and has also considered the available sanctions for such misconduct. After thorough consideration, the Court has determined that sanctions less severe than dismissal would not be adequate given the seriousness of the misconduct....
 

 We conclude that this sufficiently demonstrates that Judge Spainhour considered lesser sanctions before ordering a dismissal.
 

 E.
 

 Thus, we conclude that Judge Spainhour did not abuse his discretion by dismissing Melton's claims. The corresponding assignments of error are overruled, and the dismissal order is affirmed.
 

 II.
 

 We next address Melton's argument that Judge Seay erred by denying the motion to recuse Judge Spainhour.
 
 [1]
 
 This contention lacks merit.
 

 "[A] party has a right to be tried before a judge whose impartiality cannot reasonably be questioned."
 
 State v. Fie,
 

 320 N.C. 626
 
 , 627,
 
 359 S.E.2d 774
 
 , 775 (1987). Therefore, "[o]n motion of any party, a judge should [be] disqualf[ied] ... in a proceeding in which his impartiality may reasonably be questioned, including but not limited to instances where ... he has a personal bias or prejudice concerning a party...." Code of Judicial Conduct, Canon 3(C)(1)(a) (2005).
 

 Melton insists that Judge Spainhour's impartiality was suspect because his daughter, while in law school, was hired to work as a summer associate in the media and communications law department of the firm representing Tindall. The record tends to show that, upon being informed of the offer of employment to his daughter, Judge Spainhour informed counsel for all of the parties involved in the pedestrian walkway litigation, and none objected to his continuing to act as the presiding judge. At a 29 April 2003 hearing, Judge Spainhour again informed counsel for the plaintiffs and defendants in the pedestrian walkway matter of his daughter's employment. Judge Spainhour also indicated that he had consulted with the North Carolina Judicial Standards Commission, which had confirmed that his disqualification was not required. Again, no party objected to Judge Spainhour continuing to preside over any of the pedestrian walkway cases. On 31 October 2003, Judge Spainhour sent an e-mail to counsel for Melton, Tindall, and the Speedway stating that his daughter would be working a second summer with Tindall's law firm. The record indicates that Judge Spainhour's daughter had no knowledge of, and no involvement with, the pedestrian walkway litigation.
 

 In addition to the general rules requiring impartiality, a judge must be disqualified from hearing a case in which his son or daughter is "acting as a lawyer in the proceeding." Code of Judicial Conduct, Canon 3(C)(1)(d)(ii) (2005). However, in the instant case, Judge Spainhour's daughter was not acting as a lawyer in the pedestrian walkway cases, and there is no indication that the circumstances attending her summer employment in any way prevented Judge Spainhour from being evenhanded and unbiased. Therefore, his daughter's employment situation did not require Judge Spainhour's recusal.
 

 Melton next argues that Judge Spainhour had to be recused because he strongly encouraged the parties to reach a settlement. Specifically, Melton takes issue with an e-mail to his attorney and Tindall's attorneys in which Judge Spainhour noted that he was "concerned" about Tindall's motion to strike filed after Melton's court-ordered deposition and suggested that the parties "seriously re-visit the idea of a settlement before... the hearing [on the motion]." We note that a trial judge's decision to "explor[e] settlement possibilities [is] a function to be commended to all trial judges
 in civil cases" and is not generally a ground for disqualifying a judge.
 
 Roper v. Thomas,
 

 60 N.C.App. 64
 
 , 76,
 
 298 S.E.2d 424
 
 , 431 (1982),
 
 disc. review denied,
 

 308 N.C. 191
 
 ,
 
 302 S.E.2d 244
 
 (1983). Moreover, even where a trial judge becomes ostensibly angry at the failure of settlement negotiations, his disqualification is not necessarily required under the law.
 
 State v. Kamtsiklis,
 

 94 N.C.App. 250
 
 , 258-59,
 
 380 S.E.2d 400
 
 , 404,
 
 appeal dismissed, disc. review denied,
 

 325 N.C. 711
 
 ,
 
 388 S.E.2d 466
 
 (1989). In the instant case, we are unpersuaded that Judge Spainhour's suggestion that the parties settle was improper. Therefore, Judge Seay did not err by declining to order recusal on this ground.
 

 Finally, Melton alleges impropriety in Judge Spainhour's refusal to allow videotaped testimony of Melton's expert witnesses. The record indicates that Judge Spainhour established very specific guidelines for the taking of videotaped, "for-trial" depositions and that Melton had not complied with these guidelines. Accordingly, Judge Spainhour denied his request to allow videotaped testimony of Melton's expert witnesses. This ruling did not constitute a ground for recusal in light of the facts and circumstances of the instant case.
 
 See Love v. Pressley,
 

 34 N.C.App. 503
 
 , 506,
 
 239 S.E.2d 574
 
 , 577 (1977) ("[T]he fact that a trial judge has repeatedly ruled against a party is not grounds for disqualification of that judge absent substantial evidence to support allegations of interest or prejudice."),
 
 disc. review denied,
 

 294 N.C. 441
 
 ,
 
 241 S.E.2d 843
 
 (1978).
 

 Thus, we conclude that Judge Seay did not err by denying Melton's motion to recuse Judge Spainhour. The corresponding assignments of error are overruled, and the recusal order is affirmed.
 

 For the foregoing reasons, the orders appealed from are
 

 Affirmed.
 

 Judges TIMMONS-GOODSON and TYSON concur.
 

 Melton has also filed a petition for writ of
 
 certiorari
 
 requesting review of Judge Seay's recusal order "[i]n the event this Court determine[d] the [r]ecusal [o]rder ... [was] not appealable." As we have determined that the recusal order is appealable, the petition for a writ of
 
 certiorari
 
 is denied.